# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MAMMAR AMEUR,
    Detainee (ISN 939)
    United States Naval Station
    Guantánamo Bay, Cuba,

    *Petitioner/Plaintiff*

    v.

GEORGE W. BUSH,
    President of the United States
    The White House
    1600 Pennsylvania Avenue, NW
    Washington, DC 20500;

ROBERT GATES,
    United States Secretary of Defense
    Department of Defense
    1000 Defense Pentagon
    Washington, DC 20301-1000;

REAR ADMIRAL DAVID M.
THOMAS, JR.
    Commander, Joint Task Force-
    Guantánamo
    JTF-GTMO
    APO AE 09360; and

ARMY COL. BRUCE VARGO,
    Commander, Joint Detention
    Operations Group, JTF-GTMO
    JTF-GTMO
    APO AE 09360,

    *Respondents/Defendants.*

**AMENDED PETITION FOR
WRIT OF HABEAS CORPUS
AND COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

Civil Action No. 05-573 (RJL)

Mammar Ameur (hereinafter "Petitioner," "Plaintiff," or "Mr. Ameur") seeks the Great Writ.   A citizen of Algeria, Mr. Ameur has been imprisoned without charge or cause by the United States for nearly six years, and is now being held at Guantánamo Bay Naval Station.   He is a civilian who has never participated in or abetted armed activities against the United States or its allies, and was cleared for transfer nearly three years ago by Respondents.

Mr. Ameur's tragic ordeal began in Peshawar, Pakistan on July 18, 2002.   On that night, he and his upstairs neighbor were abducted at gunpoint from their homes by Pakistani forces accompanied by a U.S. operative.   The U.S. and Pakistani agents came seeking Mr. Ameur's neighbor, but because Arabs in Pakistan at the time tended to be viewed with great suspicion and targeted for indiscriminate roundups, the U.S. agent ordered Mr. Ameur's capture over his Pakistani counterparts' protests.

Respondents confined Mr. Ameur to a dark cell in a Pakistani dungeon for over six months, transferred him to the U.S. base at Bagram, Afghanistan, where he was held for two months, and finally transported him to Guantánamo Bay, Cuba on March 23, 2003.   His detention persists notwithstanding Respondents' failure to charge Mr. Ameur with any crime or to present any evidence of terrorist or criminal activity by Mr. Ameur. Mr. Ameur's neighbor, the actual target of the U.S.-Pakistani raid on Mr. Ameur's residence has since been released, yet Mr. Ameur himself continues to languish in U.S. custody.

Respondents' own Administrative Review Board ("ARB"), authorized Mr. Ameur's transfer out of Guantánamo nearly three years ago.   Despite this finding, he

continues to be imprisoned.  The ARB was created to provide yearly review of whether continued detention is justified.  In numerous public statements and testimonies under oath before Congress, ranking officials in the United States Departments of Defense, Justice, and State have pointed to the creation and implementation of the ARBs as part of Respondents' purported commitment to ensure that prisoners at Guantánamo are not detained "any longer than necessary."  Such statements are belied by the experience of Mr. Ameur.

Mr. Ameur has been detained without lawful basis, without charge, and without any fair process by which he might challenge his detention for nearly six years.  He has been authorized to leave Guantánamo for nearly three of those years, but neither Petitioner nor his counsel has received any information regarding if or when he will be transferred, while two other detainees have been repatriated to Algeria by Respondents, one of whom had not been cleared for transfer.  Mr. Ameur is being held thousands of miles from his family, under color of law, and in violation of the Constitution, laws and treaties of the United States, as well as in contravention of customary international law. Accordingly, this Court should issue a Writ of Habeas Corpus compelling Respondents either to release Petitioner or to establish in this Court a lawful basis for his detention.[1] This Court should also order injunctive and declaratory relief, including regular telephonic access to his family without unreasonable restrictions.

Pursuant to the President's authority as Commander-in Chief, his authority under the laws and usages of war, under the November 13, 2001 Executive Order, or the Authorization for the Use of Military Force, Respondents/Defendants (hereinafter

---

[1] As per Federal Rule of Civil Procedure 15(a), Respondents shall plead in response to this amended petition within ten days of its service on counsel, unless the Court orders otherwise.  For this reason, production of Respondents' factual return is due by July 24, 2008.

"Respondents") George W. Bush, President of the United States; Robert Gates, U.S. Secretary of Defense; Rear Admiral David M. Thomas, Jr., Commander of Joint Task Force-Guantánamo ("JTF-GTMO"); and Army Colonel Bruce Vargo, Commander, Joint Detention Operations Group, JTF-GTMO, are either ultimately responsible for, or have been charged with the responsibility of maintaining, the custody and control of the detained Petitioner at Guantánamo.

## I.    JURISDICTION

1.    Petitioner brings this action pursuant to 28 U.S.C. §§ 2241(a), (c)(1) and (c)(3) and 2242, and invokes this Court's jurisdiction under 28 U.S.C. §§ 1331, 1350, and Articles I(9)(2) and III(2) of the United States Constitution.

2.    This Court is empowered under 28 U.S.C. § 2241 and the Constitution to grant this Writ of Habeas Corpus and to entertain the instant Petition under 28 U.S.C. § 2242.  This Court is empowered to declare the rights and other legal relations of the parties herein by 28 U.S.C. § 2201, in accordance with Fed. R. Civ. P. 57; to effectuate and enforce declaratory relief by all necessary and proper means by 28 U.S.C. § 2202, as this case involves an actual controversy within the Court's jurisdiction; and to issue all writs necessary or appropriate in aid of its jurisdiction by 28 U.S.C. § 1651.

3.    This Court's jurisdiction to entertain the Petition is further confirmed by the United States Supreme Court's rulings in *Boumediene v. Bush*, 128 S. Ct. 2229 (2008), and *Rasul v. Bush*, 542 U.S. 466 (2004).  The Supreme Court recognized that Guantánamo petitioners "are entitled to the privilege of habeas corpus to challenge the legality of their detention" and that "questions regarding the legality of the detention are

to be resolved in the first instance by the District Court." *Boumediene*, 128 S. Ct. at 2240, 2262.

## II.    PARTIES

4.    Petitioner is a citizen of Algeria who is presently incarcerated and unlawfully held in Respondents' custody and control at Guantánamo.  Petitioner acts on his own behalf through counsel.

5.    Respondent George W. Bush is the President of the United States and Commander-in-Chief of the United States military.   Mr. Ameur is being detained pursuant to President Bush's authority as Commander-in-Chief, under the laws and usages of war, pursuant to the Executive Order of November 13, 2001, Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism, 66 Fed. Reg. 57,833 (November 13, 2001) (hereinafter "Executive Order") or, alternatively, under Joint Resolution 23, the Authorization for the Use of Military Force, Pub. L. 107-40, 115 Stat. 224 (Sept. 18, 2001) (hereinafter "AUMF").  President Bush is responsible for Mr. Ameur's unlawful detention and is sued in his official capacity.

6.    Respondent Robert Gates is the United States Secretary of Defense. Pursuant to the President's authority as Commander-in-Chief, his authority under the laws and usages of war or, alternatively, pursuant to the Executive Order or the AUMF, Respondent Gates has been charged with maintaining the custody and control of Mr. Ameur.  He is sued in his official capacity.

7.    Respondent Rear Admiral David M. Thomas, Jr. is the Commander of JTF-GTMO, the task force running the detention operation at Guantánamo Bay.  He has supervisory responsibility for Mr. Ameur and is sued in his official capacity.

8.     Respondent Army Colonel Bruce Vargo is the Commander of the Joint Detention Operations Group, which manages JTF-GTMO's detention camps, including the facility where Petitioner is presently held.  He is the immediate custodian responsible for Petitioner's detention and is sued in his official capacity.

### III.     STATEMENT OF FACTS

9.     Mammar Ameur is a citizen of Algeria who was captured with no valid justification and is days from completing the sixth year of his wrongful imprisonment by Respondents despite being cleared for transfer nearly three years ago.

10.     Mr. Ameur was born in Laghouat, Algeria on December 1, 1958.  His father was a tailor by trade and also worked as a driver.  Mammar Ameur is the oldest of seven children, five of whom are female.

11.     Following his graduation from secondary school, Mr. Ameur completed his two years of mandatory military service from 1979 to 1981.  Mr. Ameur then entered the workforce and distinguished himself as a model employee.  He worked for two American companies in Algeria, including as a radio-operator for the Houston-based Parker Drilling Company, Ltd. and as a supervisor of work crews for the San Francisco-based engineering firm Bechtel.

12.     Mr. Ameur received glowing praise from his superiors.  One Bechtel supervisor characterized Mr. Ameur as a "very helpful" translator and a "willing worker." Another wrote, "[Mr. Ameur] adapts himself perfectly to new tasks that he is delegate [*sic*] and can be, if required, entrusted with increasing responsibilities which he will assme [*sic*] in [*sic*] professional manner."

13.     Seeking to assist the impoverished Afghan refugees who had fled to Pakistan during the period of Soviet invasion and occupation, Mr. Ameur obtained a passport and visa and left Algeria for Pakistan on July 17, 1990.  For almost two years, he worked as a volunteer, collecting food, medicine, and clothing from charitable organizations to distribute to displaced Afghans.  He occasionally received a stipend for his work.  As a prerequisite to his employment, he obtained official permits issued by the Pakistani government.

14.     Mr. Ameur considered returning to Algeria in 1992.  However, by this time the Algerian Civil War had begun and Algerians returning from Pakistan risked persecution by many groups, including the Armed Islamic Group known as "GIA," which had been engaged in a deadly civil war throughout the country.

15.     Rather than risk his life in order to return to Algeria, Mr. Ameur remained in Pakistan and arranged for his fiancée to join him.  The couple married in January 1993.

16.     From 1992 through 1994, Mr. Ameur worked primarily as an administrator for two Muslim charitable non-governmental organizations, the Afghan Reconstruction Organization (ARCON) and the Human Relief Agency, where his supervisor described him as a "very motivated, cooperative and high endeavor person."

17.     He then received an offer to perform more humanitarian work for the African Muslim Agency (AMA).  The position required him to travel to Kenya for a short traineeship prior to being assigned to a third country and formally taking up employment with the charity.  While in Kenya, Mr. Ameur was offered a position with the AMA in Gambia.  However, by this time his passport had expired and the Algerian Embassy in Kenya informed him he must return to Algeria in order to renew it.  Mr. Ameur believed

that he could not safely return to Algeria.  Because of this delay, the AMA filled the position in Gambia, but offered Mr. Ameur another position in the Central African Republic instead.  He was unable to accept this job offer either as a result of the difficulty in obtaining a passport.

18.     Mr. Ameur returned to Pakistan, where his reentry visa and residency permit were still valid.  Upon returning, he and his wife and three children moved into a ground floor, one room apartment in a small two-story house on Bilal Lane in the Pakistani city of Peshawar.

19.     Without a valid passport, Mr. Ameur could not get a job.  He repeatedly visited the Algerian Embassy to plead with officials to renew his passport but, because Algerians living in Pakistan were automatically viewed with suspicion by the Algerian government, his entreaties were rebuffed, and he was told that he would have to return to Algeria to renew his passport.

20.     Unable to earn a living without valid papers, he applied for asylum in Pakistan with the United Nations High Commissioner for Refugees (UNHCR).  The UNHCR granted Mr. Ameur and his family refugee status in Pakistan in 1996.

21.     For the next six years, Mr. Ameur and his family led a meager existence. Although he had received refugee status and attendant work authorization, Mr. Ameur remained unable to find formal employment.  He struggled to support his family using his UNHCR stipend of 7,000 rupees per month (then approximately US$150).   He supplemented this income by buying and selling small quantities of honey in Peshawar and Islamabad and by checking the quality of larger lots of honey on behalf of other traders.

22.     Mr. Ameur's inability to work regularly led him to write to UNHCR for additional assistance for him and his family.  Because he was unemployed in Pakistan but could not return to Algeria, Mr. Ameur contemplated uprooting his family to Zimbabwe, where he had been offered work.  In late 1998, he wrote to a UNHCR representative requesting travel assistance so that he could move his family to Zimbabwe and take up employment, but he did not receive a reply to this request.

23.     Mr. Ameur finally decided to return to Algeria in the first half of 2002. His continuing inability to find stable employment in Pakistan compelled him to take action and, with his country improving after a long civil war, he decided that it would likely be safe to return.  He made preliminary arrangements with the Algerian embassy to ship his furniture to Algeria and obtain temporary travel documents for him, his wife, and their four children.  His plans would not come to pass.

24.     Following the terrorist attacks of September 11, 2001 and as part of its effort to cooperate with the United States in its "Global War on Terror," the Pakistani intelligence agencies began a well-documented and indiscriminate roundup of Arabs residing in Pakistan.  Many Arabs in Pakistan were sold for bounties paid by the U.S. government.  Pervez Musharraf, *In the Line of Fire: A Memoir* 237 ("We have earned bounties totaling millions of dollars.  Those who habitually accuse us of 'not doing enough' in the war on terror should simply ask the CIA how much prize money it has paid to the government of Pakistan."); *see also* Mark Denbeaux and Joshua Denbeaux, *Report on Guantanamo Detainees: Profile of 517 Detainees through Analysis of Department of Defense Data* 3 (finding that "86% of the detainees captured by Pakistan

or the Northern Alliance were handed over to the United States at a time in which the United States offered large bounties for capture of suspected enemies").

25.     At approximately 1:30 a.m. on the night of July 18, 2002, Mr. Ameur and his wife were awakened by a group of about forty uniformed Pakistanis, armed with AK-47s, who had gathered outside his home.  The men were led by a man with an American accent, whom Mr. Ameur believes was a CIA agent, and accompanied by a Pakistani civilian agent.

26.     Mr. Ameur opened the door for the men, introduced himself, and provided the men with his UNHCR identification document.  The men sought his upstairs neighbor, a Sudanese Arab named Adel Hassan Hamad.  Mr. Ameur informed the men that Mr. Hamad was upstairs.  They took Mr. Ameur upstairs with them, where they found Mr. Hamad sleeping in his bed and arrested him.

27.     After initially ignoring Mr. Ameur, the Pakistani police reluctantly took Mr. Ameur into custody at the behest of their American leader, who had taken an interest in Mr. Ameur based on his nationality, as reflected by his UNHCR document.  According to Mr. Ameur and his wife, the Pakistanis opposed Mr. Ameur's arrest, pointing out to the American that they did not come seeking him, but the American ordered that both Mr. Hamad and Mr. Ameur be arrested.  The Pakistanis eventually complied with the American's command, and detained Mr. Ameur too.

28.     The men told Mr. Ameur's wife that her husband would only be gone for two days.

29.     Mr. Ameur and his neighbor were taken to a prison in Pakistan and placed in separate cells.  Mr. Ameur did not see sunlight, except once or twice by accident, for over six months and was interrogated twice by the same U.S. agent who abducted him.

30.     During these six months, Mr. Ameur was allowed no contact with his family or the ICRC.  He was only allowed a Koran.

31.     After six months and ten days, Mr. Ameur was transferred to Bagram air base in Afghanistan, where he was held and interrogated, many times for forty-eight hours at a time, for another two months.  Except for one hour, he saw no sunlight during this time.  He was exposed to loud music, dogs, and random beatings by guards.  He was forced to stand or kneel for prolonged periods of time.

32.     Finally, Mr. Ameur was transferred to Guantánamo on or about March 23, 2003.  His flight transited through Incirlik, Turkey, and Portuguese jurisdiction.

33.     Mr. Ameur is not, nor has he ever been, an enemy alien, lawful or unlawful belligerent, or combatant of any kind under any definition adopted by the United States Government in any civil or military proceeding.  Mr. Ameur has never engaged in combat against the United States or its allies in Afghanistan or anywhere else, nor has he provided material support for acts of terrorism.

34.     Because Mr. Ameur did not participate in any armed conflict against the United States or its allies at any point in time or in the attacks of September 11, 2001 in any way, he is not properly detained pursuant to President Bush's authority as Commander-in-Chief under the laws and usages of war, or the AUMF.

35.     On information and belief, President Bush has never certified or determined in any manner, in writing or otherwise, that Mr. Ameur is subject to the

Executive Order of November 13, 2001.  Even if he were being detained pursuant to the Executive Order, Mr. Ameur is not properly subject to it because he has never been a member of al-Qa'ida, has never been involved in acts of international terrorism against the United States, and has never knowingly harbored anyone who has.

36.     Further, Petitioner is not, nor has he ever been, an "enemy combatant" who was "part of or supporting forces hostile to the United States or coalition partners in Afghanistan and who were engaged in an armed conflict against the United States there." *Hamdi v. Rumsfeld*, 542 U.S. 507, 516 (2004).

37.     Despite the lack of evidence to support the designation, Mr. Ameur was declared an "enemy combatant" by the Combatant Status Review Tribunal ("CSRT") on October 26, 2004.  A CSRT is a non-adversarial hearing conducted pursuant to rules and procedures that are unfair in design and biased in practice.  Detainees are denied access to counsel as well as the right to see evidence against them, confront or even know the identity of accusers, call witnesses, present evidence, or know how the evidence against them was collected.  CSRT rules and procedures further allow for the consideration of hearsay evidence and evidence obtained by torture or coercion.  The CSRT process is notoriously flawed.  *See Upholding the Principle of Habeas Corpus for Detainees: Hearing Before the H. Armed Serv. Comm.*, 110th Cong. (July 26, 2007) (testimony of Lt. Col. S. Abraham) ("In my observation [as a member of a CSRT panel], the system was designed to fail.  This Committee should place no reliance on the procedures or the outcomes of those tribunals.  The CSRT panels were an effort to lend a veneer of legitimacy to the detentions, [but] [t]he CSRTs were not provided with the information necessary to make any sound, fact-based determinations as to whether detainees were

enemy combatants."). The Supreme Court has criticized the CSRT process, stating that "even when all the parties involved in this process act with diligence and in good faith, there is considerable risk of error in the tribunal's findings of fact. . . . [which is] a risk inherent in any process that . . . is 'closed and accusatorial.'" *Boumediene v. Bush*, 128 S. Ct. 2229, 2270 (2008) (quoting *Bismullah v. Gates*, 514 F.3d 1291, 1296 (D.C. Cir. 2008)).

38.     Respondents leveled eight accusations against Mr. Ameur, each groundless. Some directly contradicted the claims that U.S. interrogators had made during Mr. Ameur's interrogations. For example, the CSRT accused him of membership in "an armed Algerian resistance group," presumably the GIA. In his response, Mr. Ameur noted that the interrogators had repeatedly accused him of membership in both the GIA and the Muslim Brotherhood, two groups Mr. Ameur describes as having diametrically opposed beliefs and methods. *See* Tr. Of Summarized CSRT Testimony ("CSRT Tr."), Detainee #939, at 1531–32 (all cited CSRT testimony summaries available at www.dod.mil/pubs/foi/detainees/csrt/).

39.     Other allegations appeared to have been invented for the purpose of the hearing. When the CSRT presented him with a series of questions he had never been asked in his countless previous interrogations, an exasperated Mr. Ameur responded: "I was not interrogated on this point, and most of these were not covered in my interrogation; it's been many years, and I find myself being accused of something I've never been interrogated for. . . . What I mean was that I was never interrogated for these points for 2 ½ years. The question is: why have I been in hell for 2 ½ years, and not interrogated on these points?" CSRT Tr., at 1527.

40.     Later in the CSRT proceeding, Mr. Ameur was presented with a trio of linked "allegations."  First, the CSRT asserted that he worked for the African Muslim Agency (AMA); second, the tribunal declared that AMA is "linked" to Al-Ittihad al-Islami (AIAI); and third the panel charged that AIAI is listed as a terrorist organization in Executive Order 13,224.  CSRT Tr., at 1528-30.

41.     Mr. Ameur stated that he attended a humanitarian aid training session for the AMA in Kenya, though he pointed out that, due to passport problems, he never actually worked for the organization.  CSRT Tr., at 1533.

42.     Neither Mr. Ameur nor the Tribunal President understood how his brief contact with AMA, an organization that the U.S. State Department's Bureau of Democracy, Human Rights and Labor has recognized as doing important humanitarian work in Africa, could lead to the conclusion that he is linked to AIAI, an organization that he is not accused of having any knowledge of or involvement with.  *See* U.S. Department of State, Bureau of Democracy, Human Rights and Labor, *International Religious Freedom Report 2006*: *Mozambique*, (noting the AMA's "humanitarian work" throughout the country) *available at* http://www.state.gov/g/drl/rls/irf/2006/71315.htm; *see also* U.S. Department of State, Bureau of Democracy, Human Rights and Labor, *International Religious Freedom Report 2005: Zimbabwe*, (describing the AMA "humanitarian projects in rural areas") *available at* http://www.state.gov/g/drl/rls/irf/2005/51503.htm.

43.     When presented with this allegation, a befuddled Mr. Ameur replied:

Detainee: what is my role in this point?

Tribunal President: I don't know; this is the first time we've seen this allegation.

Detainee: I'm like you; this is the first time, and I've mentioned before I've been here 2½ years, and never been asked by the interrogators of this.

Tribunal President: OK; I think that answers the allegation.

CSRT Tr., at 1529-30.

44.    Despite the absurdity of the charges, the CSRT declared Mr. Ameur an enemy combatant and ordered his continued detention.  Since declaring him an enemy combatant in December 2004, Respondents have not charged Mr. Ameur with any crime or produced factual returns or evidence of any kind linking him to any criminal or terrorist activity.

45.    Following the Supreme Court's decisions in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), and *Rasul v. Bush*, 542 U.S. 466 (2004), the Department of Defense announced the creation of the ARBs.  According to Department memorandums, the ARBs are staffed by experienced military officers selected by the Designated Civilian Official, in this case Deputy Secretary of Defense Gordon England.[2]

46.    The ARBs were created "to determine whether the enemy combatant represents a continuing threat to the U.S. or its allies" or can be transferred from Guantánamo.  Memorandum from Deputy Secretary of Defense Gordon England to Secretaries of the Military Departments, Chairman of the Joint Chiefs of Staff, and Undersecretary of Defense for Policy, at 2 (July 14, 2006) (outlining "Revised

---

[2] According to the Department of Defense:

> [t]he ARB shall be composed of military officers appointed by the DCO, who will sit in panels of three members each. Each three-member panel will include a Presiding Officer (PO), who will carry a service grade of O-6, and at least one officer with experience in the field of intelligence…. Military officers assigned to serve as ARB members shall be those who are, in the DCO's view, qualified for the duty by reason of education, training, experience, length of service, temperament, and objectivity. Panel members shall carry a service grade of O-4 or higher (except the Presiding Officer), have a minimum security clearance of TOP SECRET, and may be selected from among all the military services. ARB Memo, Administrative Review Board Process, encl (3), § 2 "ARB Structure."

Implementation of Administrative Review Procedures for Enemy Combatants Detained at U.S. Naval Base Guantánamo Bay, Cuba") (hereinafter "ARB Memo").

47.     Officials in the Justice and State Departments have pointed to the ARBs as evidence of the fairness of proceedings for the men held at Guantánamo.  While Attorney General, Alberto Gonzales described the ARBs as evidence that the United States government is "anxious" to provide detainees with due process beyond that which is required by the Geneva Conventions.  *See* Alberto Gonzales, Attorney General, Department of Justice, Address at the U.S. Air Force Academy (November 18, 2006) ("That the government is so anxious to give these rights to enemy combatants, who are not U.S. citizens and are not in the United States, should make it obvious that the government is even more committed to ensuring that the civil liberties of Americans are zealously guarded.").

48.     Department of Defense Principal Deputy General Counsel Daniel Dell'Orto described the ARBs to Congress as an "unprecedented" procedural protection "created . . . to ensure that [the United States] detain[s] individuals no longer than necessary."  *Habeas Corpus for Detainees: Hearing Before the H. Armed Serv. Comm.*, 110th Cong. (July 26, 2007) (statement of Daniel J. Dell'Orto, Principal Deputy General Counsel, Department of Defense).

49.     Other ranking officials in the Executive Branch have testified in similar terms.  *See, e.g.*, *Legal Rights of Guantanamo Detainees*: Hearing Before the S. Judiciary Comm., 110th Cong. (Dec. 11, 2007) (statement of Steven A. Engel, Deputy Assistant Attorney General) ("To ensure that enemy combatants are not held any longer than

necessary, the Department of Defense [established the ARBs].  Those tribunals reassess, on an annual basis for each detainee, the need for continued detention.").

50.     Mr. Ameur's first and only Administrative Review Board hearing took place on August 18, 2005.  On November 4, 2005, the ARB cleared Mr. Ameur to leave Guantánamo.  *See* Administrative Review Board Assessment and Recommendation ISN 939 (Algeria).   Respondents first notified Petitioner's counsel of this decision on February 22, 2007 and Respondents did not directly advise Mr. Ameur of the ARB decision authorizing his transfer until September 4, 2007.

51.     Mr. Ameur remains confined on Guantánamo, more than thirty-two months—or nearly 1,000 days—after the ARB decision approving his transfer.

52.     Meanwhile, two other Algerian detainees have been transferred to Algeria by Respondents.  To the best of counsel's knowledge, one of the transferred Algerians was not cleared by the ARB.

53.     Though increasingly dismayed by his continuing detention, Mr. Ameur has fully cooperated with all of the requests made to him by military officials.  He has not been interrogated for over a year.

54.     Mr. Ameur has been held in Camp IV for the bulk of his confinement at Guantánamo.  Camp IV is reserved for the most cooperative detainees.

55.     Due to his relatively advanced age and even temperament, Mr. Ameur plays an informal role among the detainees as a "manager" in Camp IV.  He has even served as a father-figure for the younger detainees and a mediator in disputes they have had with U.S. military guards, who treat him with respect bordering on deference and refer to him by the sobriquet "the lawyer."

56.     Since being approved to leave Guantánamo almost three years ago, Mr. Ameur has done little but patiently wait to be reunited with his family in Algeria. Respondents have not offered any information about when or even whether he will be transferred.  Meanwhile, Mr. Ameur continues to languish at Guantánamo.  For him, the ARB's designation has been meaningless.  Without the Court's intercession, Mr. Ameur, now nearly fifty years old, remains trapped at Guantánamo indefinitely.

## IV.     CAUSES OF ACTION

## **FIRST CLAIM FOR RELIEF**

### **(ARTICLE I OF THE UNITED STATES CONSTITUTION—VIOLATION OF THE SUSPENSION CLAUSE)**

57.     Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

58.     Respondents' arrest and continued detention of Petitioner violate the United States Constitution, Habeas Corpus Suspension Clause, Art. I, § 9, cl. 2, because the Suspension Clause guarantees Petitioner the right to be charged criminally or released.  Petitioner has been and continues to be detained without charge.

59.     Respondents' arrest and continued detention of Petitioner violate the United States Constitution, Habeas Corpus Suspension Clause, Art. I, § 9, cl. 2, because the Suspension Clause guarantees Petitioner the right to an adequate and meaningful judicial process.  Petitioner has been and continues to be detained without such process.

60.     Respondents have seized and continue to detain Petitioner without affording him fundamental due process.

61.     Accordingly, this Court should grant Mr. Ameur's petition for writ of habeas corpus, order his immediate release from custody, and enter declaratory, injunctive, and any other relief the Court may deem appropriate.

**SECOND CLAIM FOR RELIEF**

**(ARTICLE II OF THE UNITED STATES
CONSTITUTION—UNLAWFUL DETENTION)**

62.     Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

63.     Petitioner is not, nor has he ever been, an enemy alien, lawful or unlawful belligerent, or combatant of any kind.  The Executive lacks the authority to order or direct military officials to detain civilians who are seized far from the theater of war or occupied territory or who were not "carrying a weapon against American troops on a foreign battlefield." *Hamdi v. Rumsfeld*, 542 U.S. 507, 522n.1 (2004).

64.     By the actions described above, President Bush has exceeded and continues to exceed the Executive's authority under Article II of the United States Constitution by authorizing, ordering and directing that military officials seize Petitioner and transfer him to military detention, and by authorizing and ordering his continued military detention at Guantánamo.  All of the Respondents acted and continue to act without lawful authority by directing, ordering, and/or supervising the seizure and military detention of Petitioner.

65.     The military seizure and detention of Petitioner by the Respondents is *ultra vires* and illegal because it is in violation of Article II of the United States Constitution. To the extent that the Executive asserts that Petitioner's detention is

authorized by the Executive Order, that Order exceeds the Executive's authority under Article II and is *ultra vires* and void on its face and as applied to Petitioner.

66.     To the extent that Respondents assert that their authority to detain Petitioner derives from a source other than the Executive Order, including the Executive's inherent authority to conduct foreign affairs or to serve as Commander-in-Chief of the U.S. Armed Forces, whether from Article II of the Constitution or otherwise, Respondents lack that authority as a matter of fact and law.  Accordingly, Petitioner is entitled to habeas, declaratory, and injunctive relief, as well as any other relief the Court may deem appropriate.

## THIRD CLAIM FOR RELIEF

### (COMMON LAW DUE PROCESS AND DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION—UNLAWFUL DEPRIVATION OF LIBERTY)

67.     Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

68.     By the actions described above, Respondents, acting under color of law, have violated and continue to violate common law principles of due process as well as the Due Process Clause of the Fifth Amendment to the Constitution of the United States.

69.     President Bush has ordered the prolonged, indefinite, and arbitrary detention of individuals including Petitioner, without due process of law, and the remaining Respondents have implemented those orders.  Respondents' actions deny Petitioner the process accorded to persons seized and detained by the United States military, to the extent that there is an armed conflict, as established by, *inter alia*, the Uniform Code of Military Justice, Army Regulation 190-8, the Third and Fourth Geneva

Conventions, and customary international law as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

70.    To the extent that Petitioner's detention purports to be authorized by the Executive Order, that Order violates the Fifth Amendment on its face and as applied to Petitioner.

71.    Accordingly, Petitioner is entitled to habeas, declaratory, and injunctive relief, and any other relief the Court may deem appropriate.

**FOURTH CLAIM FOR RELIEF**

**(DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION—UNLAWFUL CONDITIONS OF CONFINEMENT)**

72.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

73.    By the actions described above, Respondents, acting under color of law, have violated and continue to violate the right of Petitioner to be free from unlawful conditions of confinement, in violation of the Due Process Clause of the Fifth Amendment to the Constitution of the United States.

74.    Accordingly, Petitioner is entitled to declaratory and injunctive relief as well as any other relief the Court may deem appropriate.

**FIFTH CLAIM FOR RELIEF**

**(FREE SPEECH CLAUSE OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION—PROLONGED DENIAL OF TELEPHONIC COMMUNICATION WITH FAMILY)**

75.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

21

76.     By the actions described above, Respondents, acting under color of law, have prevented and continue to prevent reasonably regular telephonic communication between Petitioner and his family, restricting his First Amendment rights in a manner not reasonably related to any legitimate penological interests.

77.     Accordingly, Petitioner is entitled to declaratory and injunctive relief as well as any other relief the Court may deem appropriate.

### SIXTH CLAIM FOR RELIEF

**(FIFTH AND SIXTH AMENDMENTS TO THE UNITED STATES CONSTITUTION—VIOLATION OF THE RIGHT TO COUNSEL AND TO ACCESS TO THE COURTS)**

78.     Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

79.     Respondents, purportedly acting from a concern for national security, consistently have contrived to intrude upon Petitioner's right to consult with counsel by conditioning counsel's access to Petitioner on unreasonable and overly restrictive terms and procedures, all in violation of Petitioner's attorney-client privilege, his work product privilege, and the Fifth and Sixth Amendments to the U.S. Constitution.

80.     Accordingly, Petitioner is entitled to habeas, declaratory, and injunctive relief, as well as any other relief the Court may deem appropriate.

### SEVENTH CLAIM FOR RELIEF

**(DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES—RENDITION)**

81.     Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

82.     On information and belief, Petitioner is at risk of being rendered, expelled or returned without lawful procedures to a country other than his own.  The transfer of the Petitioner to a country that creates a foreseeable and direct risk that he will be subjected to torture constitutes a violation of Petitioner's rights under the Due Process Clause of the Fifth Amendment to the United States Constitution.

83.     Accordingly, Petitioner is entitled to declaratory and injunctive relief, as well as any other relief the Court may deem appropriate.

## EIGHTH CLAIM FOR RELIEF

### (EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION—VIOLATION OF THE PROHIBITION OF CRUEL AND UNUSUAL PUNISHMENT)

84.     Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

85.     By the actions described above, Respondents, acting under color of law, have violated the right of Petitioner to be free from cruel and unusual punishment under the Cruel and Unusual Punishments Clause of the Eighth Amendment to the Constitution of the United States.

86.     Accordingly, Petitioner is entitled to declaratory, and injunctive relief as well as any other relief the Court may deem appropriate.

## NINTH CLAIM FOR RELIEF

### (GENEVA CONVENTIONS—UNLAWFUL DETENTION)

87.     Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

88.     By the actions described above, Respondents, acting under color of law, have denied and continue to deny Petitioner the process accorded to persons seized and detained by the United States military, to the extent that there is an armed conflict, as established by specific provisions of the Third and Fourth Geneva Conventions.

89.     Violations of the Geneva Conventions are direct treaty violations and are also violations of customary international law, and constitute an enforceable claim under 28 U.S.C. § 2241(c)(3).

90.     Respondents are liable for this conduct described above, insofar as they set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified, and/or conspired to violate the Geneva Conventions.

91.     Accordingly, Petitioner is entitled to habeas, declaratory, and injunctive relief as well as any other relief the Court may deem appropriate.

## TENTH CLAIM FOR RELIEF

### (CONVENTION AGAINST TORTURE AND CONVENTION RELATING TO THE STATUS OF REFUGEES—RENDITION)

92.     Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

93.     On information and belief, Petitioner is at risk of being rendered, expelled or returned without lawful procedures to a country other than his own.  The transfer of the Petitioner to a country that creates a foreseeable and direct risk that he will be subjected to torture constitutes a direct violation of Petitioner's rights under the U.N. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("Convention Against Torture") and the 1954 Convention Relating to the Status of Refugees, 19 U.S.T. 6259, 189 U.N.T.S. 150 *entered into force* Apr. 22, 1954.

94.     Accordingly, Petitioner is entitled to declaratory and injunctive relief, as well as any other relief the Court may deem appropriate.

## ELEVENTH CLAIM FOR RELIEF

### (ALIEN TORT STATUTE—ARBITRARY ARREST AND PROLONGED ARBITRARY DETENTION)

95.     Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

96.     The acts described herein constitute arbitrary arrest and detention of Petitioner in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting arbitrary detention as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

97.     Respondents are liable for said conduct in that they directed, ordered, confirmed, ratified, and/or conspired together and with others to bring about the arbitrary arrest and prolonged arbitrary detention of Petitioner in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting arbitrary arrest and prolonged arbitrary detention as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

98.     As a result of Respondents' unlawful conduct, Petitioner has been and is deprived of his freedom and separated from his family and is therefore entitled to declaratory and injunctive relief and such other relief as the Court may deem appropriate.

## TWELFTH CLAIM FOR RELIEF

### (ALIEN TORT STATUTE—ENFORCED DISAPPEARANCE)

99.     Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

100.     By the actions described above, the Respondents directed, ordered, confirmed, ratified, and/or conspired to bring about the enforced disappearance of Petitioner in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting enforced disappearances as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

101.     As a result of Respondents' unlawful conduct, Petitioner has been and is deprived of his freedom and separated from his family and is therefore entitled to declaratory and injunctive relief and such other relief as the Court may deem appropriate.

## THIRTEENTH CLAIM FOR RELIEF

### (ALIENT TORT STATUTE—RENDITION)

102.     Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

103.     On information and belief, Petitioner is at risk of being rendered, expelled or returned without lawful procedures to a country other than his own.  The transfer of the Petitioner to a country that creates a foreseeable and direct risk that he will be subjected to torture constitutes a violation of Petitioner's rights under customary international law, which may be vindicated under the Alien Tort Statute.

104.     Accordingly, Petitioner is entitled to declaratory and injunctive relief, as well as any other relief the Court may deem appropriate.

## FOURTEENTH CLAIM FOR RELIEF

### (VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT— ARBITRARY AND CAPRICIOUS UNLAWFUL DETENTION)

105.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

106.    Army Regulation 190-8 prohibits the detention of civilians who were seized away from the field of battle or outside occupied territory or who were not engaged in combat against the United States. *See, e.g.*, Army Reg. 190-8 at 1-6(g) ("Persons who have been determined by a competent tribunal not to be entitled to prisoner of war status may not be executed, imprisoned, or otherwise penalized without further proceedings to determine what acts they have committed and what penalty should be imposed.").

107.    By arbitrarily and capriciously detaining Petitioner in military custody for nearly six years in the manner described above, Respondents have acted and continue to act *ultra vires* and unlawfully in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2).

108.    Accordingly, Petitioner is entitled to habeas, declaratory, and injunctive relief, as well as any other relief the Court may deem appropriate.

## FIFTEENTH CLAIM FOR RELIEF

### (VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT— ARBITRARY AND CAPRICIOUS DENIAL OF DUE PROCESS)

109.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

110.     By the actions described above, Respondents, acting under color of law, have arbitrarily and capriciously denied and continue to deny Petitioner the process accorded to persons seized and detained by the United States military, to the extent that there is an armed conflict, as established by Army Regulation 190-8 in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2).

111.     Accordingly, Petitioner is entitled to habeas, declaratory, and injunctive relief, as well as any other relief the Court may deem appropriate.

## V.     PRAYER FOR RELIEF

WHEREFORE, Petitioner prays for relief as follows:

1.     Grant the Writ of Habeas Corpus and order Respondents to release Petitioner from his current unlawful detention;

2.     Order that Respondents transfer Petitioner back to Algeria;

3.     If repatriation is not presently possible, order Respondents to parole Mr. Ameur into the United States subject to reasonable conditions, consistent with *Clark v. Martinez*, 543 U.S. 371 (2005).

4.     Order that Petitioner be brought before the Court or before a Magistrate Judge assigned by the Court at a convenient facility to conduct proceedings under the supervision of the Court to vindicate his rights;

5.     Order that Petitioner cannot be transferred to a country other than Algeria without the specific, written agreement of Petitioner and Petitioner's counsel while this action is pending;

6.     Order that Petitioner cannot be delivered, returned, or rendered to a country other than his own where there is a foreseeable and imminent risk that Petitioner will be subject to torture;

7.     Order Respondents to allow Petitioner to contact his family by telephone on a reasonably regular basis;

8.     Order Respondents to cease all interrogations, direct or indirect, of Petitioner in the absence of counsel while this litigation is pending;

9.     Order and declare that Respondents' detention of Petitioner as an unlawful enemy combatant was and remains improper;

10.    Order and declare that the Executive Order of November 13, 2001 is *ultra vires* and unlawful in violation of Article II of the United States Constitution, the Fifth Amendment to the United States Constitution, the Uniform Code of Military Justice, the Administrative Procedures Act, 5 U.S.C. § 702, federal common law, the treaties of the United States and customary international law;

11.    Order and declare that the prolonged, indefinite, and restrictive detention of Petitioner is arbitrary and unlawful and a deprivation of liberty without due process in violation of common law principles of due process, the Due Process Clause of the Fifth Amendment to the United States Constitution, the regulations of the United States military, the treaties of the United States, and customary international human rights and humanitarian law; and

12.    Grant such other relief as the Court may deem necessary and appropriate to protect Petitioner's rights under the common law, the United States Constitution, federal statutes, and international law.

Dated: July 9, 2008

Respectfully submitted,

/s/_____
Ramzi Kassem
Michael J. Wishnie
*Supervising Attorneys*

Brian K. Mahanna
Joseph A. Pace
Jennifer Hojaiban
*Law Student Interns*

Allard K. Lowenstein International Human
    Rights Clinic
National Litigation Project
Yale Law School
127 Wall Street
New Haven, CT 06511
(t) (203) 432-0138
(f) (203) 432-1222
(e) ramzi.kassem@yale.edu

*Counsel for Petitioner*

## CERTIFICATE OF SERVICE

I hereby certify that on July 9, 2008, I caused true and accurate copies of Petitioner's Amended Petition for Writ of Habeas Corpus and Complaint for Declaratory and Injunctive Relief to be served upon the following person, by electronic filing and via the Court Security Officer:

Terry M. Henry, Esq.
U.S. Department of Justice
Civil Division
20 Massachusetts Avenue, NW
Washington, DC 20530

/s/_____
RAMZI KASSEM
Allard K. Lowenstein International Human
    Rights Clinic
National Litigation Project
Yale Law School
127 Wall Street
New Haven, CT 06511
(203) 432-0138
ramzi.kassem@yale.edu